IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA



| | |
|---|---|
| United States, *ex. rel.* EMELIA DOWNS, BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA,<br><br>        Plaintiffs,<br><br>        v.<br><br>INSECT SHIELD, LLC, INSECT SHIELD INTERNATIONAL, LLC, RICHARD LANE, PENTAQ MANUFACTURING CORP., GOODWILL INDUSTRIES OF SOUTHERN FLORIDA, INC., TULLAHOMA INDUSTRIES, LLC, SAN ANTONIO LIGHTHOUSE, NATIONAL INDUSTRIES FOR THE BLIND, BLUEWATER DEFENSE INC., COMPUCHEM LABARATORIES & LIBERTY ANALYTICAL CORPORATION.<br><br>        Defendants. | **CASE NO.:** 1:19CV1026<br><br>**COMPLAINT and JURY DEMAND**<br><br>**ORIGINAL COMPLAINT FILED IN CAMERA AND UNDER SEAL, PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>**\*\*DO NOT PLACE IN PRESS BOX\*\***<br>**\*\*DO NOT ENTER ON PACER\*\*** |

NOW COMES PLAINTIFF-RELATOR, Emelia "Emmy" Downs, by and through her attorneys, Sean Herrmann and Kevin Murphy of Herrmann & Murphy, PLLC, and brings this action under 31 U.S.C. §§3729–3732 (the "federal False Claims Act") to recover all damages, penalties, and other remedies established by the federal False Claims Act on behalf of the United States and herself, and shows the Court as follows:

1

# I. OVERVIEW

1. Qui Tam Relator Emelia Downs ("Emmy" or "Relator") brings this action on her own behalf and on behalf of the United States of America to recover civil damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* against Defendants Insect Shield, LLC, and Insect Shield International, LLC (collectively, the "Company" or "Defendant Company"), North Carolina limited liability companies with their principal place of business located in Greensboro, Guilford County, North Carolina and locations in Seattle Washington, Vietnam, China, and Japan; Relator Downs brings suit against Richard Lane ("Lane" or "Defendant Lane"), individually. Relator also brings claims against Pentaq Manufacturing Corp., Goodwill Industries of Southern Florida, Inc., Tullahoma Industries, LLC, San Antonio Lighthouse, National Industries for the Blind, and Bluewater Defense Inc. (collectively, the "Manufacturers" or "Defendant Manufacturers"). Finally, Relator brings claims against CompuChem Laboratories and Liberty Analytical Corporation (collectively, "CompuChem" or "Defendant CompuChem").

2. Relator's allegations relate to illicit fraud on the United States federal government—more specifically, on the Department of Defense ("DOD"). Defendants Company and Lane knowingly submitted bills to the DOD for payment for contracts to treat Army uniforms with permethrin, an insecticide that kills and/or repels ticks, mosquitos, and other insects that come into contact with treated fabric. Permethrin treatment became critical in the age of the Zika virus to help protect troops serving in vulnerable corners of the globe.

3. The DOD provided Defendants detailed guidelines on how uniforms were to be tested to ensure that they were properly treated with permethrin and, thus, effective. Defendants

2

blatantly and knowingly worked together to circumvent the DOD's testing requirements. Defendants Company and Lane constantly pushed through uniform lots that had, in fact, failed testing, and they manipulated the process and paperwork to make it appear as if the lots had passed. Defendant Manufacturers and CompuChem knowingly participated in and aided Defendant Company's fraud. Defendant Manufacturers sent Defendant Company discarded uniforms to use for permethrin testing so Defendant Company wouldn't have to pull garments from the actual lots of garments going to the Army. In other words, Defendant Company would rubber-stamp garment lots as having passed permethrin testing even though the actual garment tested was a separate, discarded uniform sent from one of the Defendant Manufacturers.

4. Defendants know, and at all relevant times knew, that they were falsifying and/or manipulating laboratory results that they presented to federal government inspections and those otherwise sent to the federal government to show passing-permethrin-level results when, in fact, the tested Army uniforms had failed the tests. Defendants also failed to otherwise follow the proper contract steps for selecting, testing, and re-testing Army uniforms, garments, and samples. Yet, they nonetheless engaged in this practice and, upon information and belief, continue to do so today. Indeed, it has been extremely lucrative for Defendants. Upon information and belief, to date, Defendants have defrauded the federal government out of millions of dollars between at least 2015 and the present.

3

## II. JURISDICTION

5. This action arises under the False Claims Act, 31 U.S.C. §3729, *et seq*.

6. This action arises under the laws of the United States, and jurisdiction over this action is otherwise conferred upon this Court by 31 U.S.C. §3730(a), 31 U.S.C. §3730(b), 31 U.S.C. §3732(a), 31 U.S.C. § 3732(b), and 28 U.S.C. §1331.

7. Venue is proper in this district pursuant to 31 U.S.C. §3732(a), which provides that "any action under §3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by §3729 occurred." At all material times to the subject of this action, Defendants resided and regularly conducted business within North Carolina, within this judicial district. Furthermore, acts proscribed by §3729, and giving rise to this action, occurred within this judicial district.

8. Pursuant to 31 U.S.C. §§ 3729, *et seq.* and N.C.G.S. § 1-605, *et. seq.*, and before filing this civil action for false claims, Relator Downs voluntarily provided to the United States Government a Confidential Pre-Filing Disclosure Statement. The United States Attorney General received the Disclosure Statement on September 12, 2019; and the United States Attorney for the Middle District of North Carolina received the Disclosure Statement on September 6, 2019.

9. Venue also lies under 28 U.S.C. § 1391(b) and (c) because Defendants transact business within this district and the facts forming the basis of this Complaint occurred within this district.

4

10. There are no bars to recovery under 31 U.S.C. §3730(e). Substantially the same allegations as those alleged in this lawsuit have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the Government or its agents were a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media. Alternatively, Relator Downs is an original source as defined in 31 U.S.C. §3730(e). Relator Downs has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Further, this action is not based upon the public disclosure of allegations or transactions in criminal, civil, or administrative hearing at the State or Federal level, or in a congressional, legislative, administrative, General Accounting Office, or State Auditor's report, hearing, audit, or investigation, or from the news media. Relator Downs has direct and independent knowledge of the information on which the allegations are based.

## III.    PARTIES

11. Relator Downs is an individual who resides in Guilford County, North Carolina. She is a citizen of the United States.

12. Defendant Insect Shield, LLC is a North Carolina limited liability company with its principal place of business located in Greensboro, Guilford County, North Carolina and locations in locations in Seattle, King County, Washington, Vietnam, China, and Japan. It conducts business in North Carolina on a daily basis.

13. Defendant Insect Shield International, LLC is also a limited liability company with its principal place of business located in Greensboro, Guilford County, North Carolina and

5

locations in locations in Seattle Washington, Vietnam, China, and Japan. It conducts business in North Carolina on a daily basis.

14. Defendant Lane resides in Guilford County, North Carolina.

15. Defendant Pentaq Manufacturing Corp. is a Puerto Rican corporation that conducts business in North Carolina.

16., Goodwill Industries of Southern Florida, Inc. is a Florida company that conducts business in North Carolina.

17. Tullahoma Industries, LLC is a Florida corporation that conducts business in North Carolina.

18. San Antonio Lighthouse is a Texas company that conducts business in North Carolina.

19. National Industries for the Blind is a Virginia company that conducts business in North Carolina.

20. Bluewater Defense Inc. is a Puerto Rican corporation that conducts business in North Carolina.

21. Defendant CompuChem Laboratories is a laboratory located in Cary, North Carolina. CompuChem is a division of Liberty Analytical Corporation, which is also based in Cary, North Carolina.

6

# IV.     FACTUAL ALLEGATIONS

**A.     The Advent of Permethrin Has Been a Game-Changer in the Insect Repellant World, and This Technology Is Particularly Important With Respect to Insects that Carry Unwanted Diseases.**

22. This case revolves around permethrin. Permethrin is a medication and insecticide. In insecticide form, it can be sprayed on clothing to kill ticks, mosquitos, and other insects that come into contact with the treated fabric.

23. By killing these bugs, permethrin provides a strong defense against unwanted bites and irritation and, more importantly, to diseases, infections, and other health issues that might be transmitted by the organisms which it repels.

24. According to the Center for Disease Control, "Permethrin-treated clothing repels and kills ticks, chiggers, mosquitoes, and other biting and nuisance arthropods." (https://wwwnc.cdc.gov/travel/yellowbook/2018/the-pre-travel-consultation/protection-against-mosquitoes-ticks-other-arthropods).

**B.     Richard Lane Founds Insect Shield to Develop, Manufacture, and Distribute Permethrin-Treated Apparel.**

25. In or around 2003, Defendant Richard Lane created a patented process for treating clothing with permethrin. This technology had the potential to do a tremendous amount of good.

26. Lane had been working on this process for some time before he created the patent. He founded Insect Shield in or around 2001 to develop, manufacture, and distribute insect repellant apparel. (https://www.insectshield.com/Company-Background.aspx).

7

27. Since its inception, Lane has been an owner of Insect Shield. Today, he owns it with CEO Haynes Griffin.

28. In July 2003, Insect Shield rolled out the first EPA-registered insect-repellant clothing apparel. (https://www.insectshield.com/Company-Background.aspx).

29. In or around 2005, the Company began treating uniforms with permethrin for West Point because troops were getting Lyme Disease. West Point had previously been using a system that put the garment-treating onus on the soldiers themselves. In other words, they would have containers full of permethrin or permethrin-like substances and were to spray or otherwise treat their own uniforms. This process wasn't working.

30. But the Company's permethrin-treated clothing proved to be effective at preventing Lyme Disease. Before long, the entire United States Army ("Army") began requiring that all uniforms be treated with permethrin. It contracted with the Company to get this done.

31. The Company is one of only two companies that treat Army uniforms with permethrin. The other's retail name is Perimeter Insect Guard, and it operates in Stonewall, Mississippi (Pinebelt) and Taylorsville, Mississippi (WarmKraft). The Company handles all Army combat uniforms, hot weather combat uniforms, and female soldier uniforms, which makes its treatment process even more vital since the outbreak of the Zika virus.

32. Indeed, the Company has publicly touted its uniform treatment process as a bulwark against the Zika virus. (https://www.insectshield.com/Zika-Virus.aspxl; https://www.consumerreports.org/insect-repellents/permethrin-treated-clothing-mosquito-bites/)

33. The Company currently has operations in Vietnam and China.

34. Lane is the Company's President.

8

**C.** **Emmy Begins Working for the Company.**

35. On or around September 14, 2015, the Company hired Emmy as a Program Manager.

36. From the beginning, Emmy's job duties included receiving shipments, shipping items, organizing government inspections, placing purchase orders, invoicing, and managing a small team of workers.

37. Emmy was responsible for sending laboratory results to the federal government. This gave her a special vantage point for observing what the Company sent to the government for payment.

38. Almost immediately after her hire, she began noticing that the Company was engaging in fraudulent practices relating to its treating and testing of permethrin-treated garments.

**D.** **Defendants Massively Defraud the Federal Government.**

    **i.** **The Company's Main Function is to Treat Army Uniforms with Permethrin.**

39. The permethrin treatment process is straightforward. Typically, workers in large textile plants weave entire uniforms. Then, a government official inspects them. After this initial inspection, the uniforms are shipped to the Company in Greensboro, North Carolina.

40. Once the Company receives the shipments, its primary task is to treat the uniforms with permethrin.

41. After treatment, the Company is supposed to inspect the uniforms for visual and manufacturing defects. By most accounts, the Company does a sufficient job with this inspection.

9

### ii. The Company Defrauds the Federal Government by Accepting Payments for Permethrin Treatment that Does Not Meet the Federal Government's Testing Requirements.

42. But the Company's next inspection is far from sufficient. After the visual/ manufacturing inspection, the Company is supposed pull random garments from the lot to be used as samples for destruction lab testing. Different types of garments are to be tested in different ways. Type I garments are non-fire resistant and made of Nylon and Cotton. Type III garments are fire resistant. Type I and Type III garments are treated with permethrin at different rates. Type I garments have an acceptable permethrin content range of 0.095 mg/cm² to 0.135 mg/cm². Type III garments have an acceptable range of .095 mg/cm² and .140 mg/cm².

43. The Company consistently certifies to the federal government that it randomly pulls garments for inspection from each lot.

44. This inspection process exists to ensure that the Army uniforms contain levels of permethrin that will make them effective in the field at warding off organisms that could adversely impact soldiers.

45. In practice, the Company pre-selects three-to-five garments for destruction lab testing. This is also fraud because the Company is supposed to randomly select garments from the lot as they come out of treatment. The garments go into large industrial washers (this is where the permethrin goes onto the garments through a vapor), and then they go into an oven (which cures the permethrin to the fabric). The three-to-five garments are supposed to be randomly selected after the Company finishes treating the garments so that they can serve as a representative sample of the whole lot. However, the Company is actually designating specific garments as lab samples before they even treat them, and marking them as test samples with

10

tags to identify them throughout the treatment process. Once the lot is at the end of the treatment process and ready to be folded and boxed, the designated lab samples are taken out of the lot. Then, the Company punches holes in the garments in three different places, creating circular fabric samples that are three inches in diameter. The Company punches these holes through both panels of fabric, front and back, from the pants and coats which creates **two** circular fabric samples from one punch. The Company selects only **one** of these fabric specimens to be sent for lab testing. The other specimen is labeled as an "adjacent sample" with a label stapled to it that details the date, lot number, and location of punch, and it is stored in a plastic Ziplock bag. If the lab results for any lot do not pass or do not conform to the permethrin content limits, these adjacent samples are labeled as if they are punched from additional samples from the lot, but in reality are just the second punch from the original lab garments. At times, if there are not enough adjacent punches left from a certain lot, the Company will pick adjacent samples from other lots that it already knows will pass, re-label them, and send them to the lab as if they are punched from additional samples from the lot. In reality, they are not from the lot at all.

46. The Company allows for Defendant Manufacturers to send second quality garments ahead of time to be used as test samples before the lot even arrives at the Company's warehouse. These second quality garments might not be treated with the lot they are supposed to be representing, but instead are sometimes treated separately in a small washer or treated with an entirely different lot.

47. This practice has allowed the Manufacturers and the Company to save a substantial amount of money. The Manufacturers would often send second-quality garments or destruction

11

laboratory samples a week before a corresponding lot would arrive. This way, the Company would not have to hold up on presenting the lot while waiting for lab results to come back. The Manufacturers are parties to the same contracts and rules for uniform testing as the Company.

48. All trousers and coats have the lot number stamped inside the garment, usually on the pocket fabric. These garments are sometimes tied to a specific lot. Other times, they're randomly tied to other lots, as needed. The garments have stamps inside the pockets indicating from which lot they came. When the Company selects a garment, it disregards its stamps. The bags will be labeled as coming from some lots, but if you look at the pockets, they'd be from somewhere else. At times, they get samples sent to them to use for lab tests, and those are the "seconds." The senders of those garments (Defendant Manufacturers) specifically tell the Company that the garments can't be used for purposes other than testing.

49. The Company then sends three fabric specimens from each garment to a laboratory in Cary, North Carolina for testing. That laboratory is called CompuChem (Liberty Analytical d/b/a CompuChem, 501 Madison Avenue, Cary, NC 27513). CompuChem tests the punches on a Gas Chromatography Mass Spectrometer. A GC Mass Spectrometer instrument separates chemical mixtures and identifies the components at a molecular level. An ASE machine uses a combination of elevated temperature and pressure with common solvents to increase the efficiency of extracting compounds from solid or semisolid samples. The time period from when the Company sends off the samples to when it receives the results from CompuChem is roughly 48 to 96 hours.

50. The lab results come back to the Company from CompuChem in two data sheets—one large and detailed and one small, with more general summaries. The sheets are signed by

12

CompuChem and then signed and stamped by the Company, who then sends them to the federal government. This form is called a DD 1222. CompuChem is aware of the Company's fraudulent scheme and actively participates in it nonetheless.

51. This testing is lot-specific. Put another way, one punch from a garment can fail so long as the average for that garment falls within the specific range. However, if one punch is over 0.170 or under 0.60, the garment automatically fails. The lots—which are groups of garments from a certain batch of fabric from specific dates that come together in pallets or boxes to the Company—could contain as few as one garment and generally don't exceed 20,000.

52. The Company's uniform testing regiment is set forth in a contract between the Company and the federal government. If a lot fails inspection—*i.e.*, the permethrin levels are not within the specified range—the Company is supposed to, per its contract with the federal government, *randomly* pull new additional specimens from additional garments from the same lot for inspection.

53. The lots are finished at the factory prior to arrival at the Company's factory. It is inconvenient and costs a significant amount of money and time for the Company to go to the warehouse, remove more pieces, punch them, and update the respective packing lists. Re-testing to make sure that the lots are treated properly with an effective level of permethrin is neither free nor easy.

54. Instead, the Company cuts corners. It pulls specimens from *already tested* individual garments from the same lot and sends them off for inspection. This makes it possible for Defendants to mix and match and cherry-pick passing scores to attach to the lot to send it

13

through without having to properly test for permethrin levels as specified by the federal government.

### iii. The Company Orders this Fraud from the Highest Levels, and Emmy Tries to Do the Right Thing.

55. President Richard Lane, Plant Manager Andy Kennedy, and Quality Control Manager[1] David Brown all specifically instruct employees at the Company to fraudulently test the garments and lie to the federal government about the results. Lane's role in the fraud is particularly egregious. He is the Company's founder, largely developed the very process used in treating the garments, and is a textile chemist. He knows the process inside-and-out and he abuses it.

56. When Emmy started with the Company in 2015, it was not following lab testing procedures, but in a different way than that at issue here. She complained to Lane, but he ignored her. She then called the Company's Director of Military, Michael Corley, in mid-2016 and complained. He got a meeting with Lane and, from that point on, the Company abandoned this inappropriate approach. In fact, the government eventually told the Company that it was testing the garments incorrectly, and the Company fixed the initial issues in 2016.

57. However, the current form of fraud—described above and below—began in earnest in early 2017. Emmy first heard about it from co-worker Shannon Ridge. Ridge, like Emmy, was responsible for sending garment punches to CompuChem. Once she fully realized what the Company was doing, Emmy confronted Lane about the practice. Not only did Lane refuse to do something about it, he warned Emmy not to tell anyone about the practice.

---

[1] This may not be his exact job title, but it is the role he performed for the Company.

58. Emmy went to Corley as she had in 2016, but nothing happened this time around.

59. In early 2018, overcome by guilt and frustration, Emmy stopped sending DD 1222 forms to the government because she knew the data contained in those forms was derived through fraud. This was part of Emmy's worry. But she also knew that military service members were almost certainly being put in harm's way because they were, unbeknownst to them, wearing garments that weren't actually passing the government's permethrin tests. Emmy started stuffing DD 1222 forms into her desk at work instead of sending them on to the government. She was scared.

60. To be more specific about to whom Emmy sent the forms as part of her job, she sent the DD 1222 forms to The Defense Contractor Management Agency ("DCMA") and the Defense Logistics Agency ("DLA"). DLA manages government contracts and makes sure contractors are complying with them. DCMA's office relevant to this case is in Greensboro, North Carolina.

61. Before long, the DCMA noticed that the forms weren't coming from the Company and emailed to let the Company know as much. In June 2018, the Company issued a Corrective Action Request. (Exhibit A.) Lane confronted Emmy. She explained that she wasn't sending the forms because she did not want to contribute to the fraud. Nonetheless, instead of fixing the problem, the Company punished Emmy. Lane told her that she had to send in the samples as instructed or the Company would fire her. Emmy stood her ground and told Lane to find someone else to send the samples. Accordingly, for roughly a week after this conversation, Ridge sent the samples instead of Emmy. However, before long, the task fell back on Emmy.

15

She felt defeated and she knew that she couldn't afford to lose her job, so she did as Lane instructed.

62. However, Emmy had decided to do something about it, and that decision ultimately led to this action. Emmy reached out to undersigned counsel for help, and she quit her job with the Company on November 14, 2018. The Company's fraudulent testing procedures were ongoing when she left and there was no plan in place to do anything about it.

E.    **A Typical Case, the Precise Mechanism of the Company's Fraud, and the Overall Effect.**

63. Analyzing specific documents helps better understand Defendants' fraud in this case.

64. Exhibit B (GL-PD 14-04A) is a Department of Defense Purchase Description with guidance for making coats, which includes permethrin treatment and testing at pages 6–7 and 34–44. Exhibit C (GL/PD 14-05A) is a similar document, but for army trousers. Exhibit D (GL/PD 07-14D) is, likewise, a Purchase agreement, but applies to Type III garments, which are fire-resistant. All of these Purchase Descriptions devote significant time to permethrin and procedures for testing permethrin-treated garments.

a. For example, Page 41 of GL/PD 14-04A establishes how permethrin testing results are to be reported and what data can undergird those reports:

> Report the permethrin concentrations in milligrams per square centimeter squared to the nearest 0.001 mg of the three (3) individual specimen per sample unit (garment) for all units sample units tested. A single individual specimen within a sample unit (garment), shall be allowed to fall outside of the minimum to maximum range of the permethrin levels as specified in paragraph 3.4.1 as long as the average of the three (3) specimens meet the specified levels. Although, for initial testing only the single individual specimen allowed to fall outside the specified range in 3.4.1 shall not fall below 0.060 mg/cm2 or above 0.170 mg/cm2 in which case the sample unit (garment) shall be considered a failure whether or not the sample average falls within the

16

minimum/maximum range specified and 3.4.1. A single retest shall be allowed; when a garment fails, a complete set of specimens shall be pulled from an additional sample unit (garment) and retested. The retest shall then be used to rate pass or fail.

b. This paragraph contains four vital pieces of guidance from the DOD. First, one individual specimen (punch) in the sample unit (garment) can fall outside the minimum or maximum permethrin level, but it can still pass so long as the average of the three specimens is within the permitted permethrin level. The DOD is clear that only a "single individual specimen" can fall outside the approved range. If two punches are outside the range it is automatically considered a failure even if the average permethrin level of the three punches falls in the appropriate spectrum.

c. Second, a single individual specimen from a garment cannot fall below 0.060 mg cm$^2$ or be above 0.170 mg/cm$^2$—such a result results in an automatic failure for the garment regardless of the average of the three punches.

d. Third, the DOD specifies that only one re-test is permitted. In other words, upon a failure, only one additional round of testing can be conducted on the lot of garments.

e. Finally, with respect to the **_one_** permitted re-test, the DOD makes clear that a complete set of punches shall be pulled from an **_additional_** garment for the re-test.

f. On page 34, of GL/PD 07-14, the DOD makes clear that permethrin garment content "[t]esting shall be conducted according to the following test method."

g. On page 36, the DOD specifies that the sample size for each lot shall three sample units (garments). Page 38 specifies that three random specimens (punches) should be pulled from each garment.

17

65. With that in mind, let's take a look at a lab report. Exhibit E shows documents that CompuChem sent the company after conducting testing in late August or early September 2018 (it is dated August 32, 2018).

a. This document contains four Lab Work Order Numbers (1808014, 1808019, 1808030, and 1808039). The four work order numbers means the Company sent in samples four times to get a passing grade for the lot at issue (17). As set forth below, the four work order numbers show fraud—the DOD only allows one round of re-testing to obtaining a passing score for the lot (this is apparent after diving into each work order in more detail, but is unclear from simply looking at the face of the document because it would be unclear what each work order was for).

b. Understanding the information on page one is helpful. In the Sample Identification column, "GDW" denotes that the sample comes from Goodwill Industries of Southern Florida, which is a facility that employs individuals with special needs to assemble garments. This is just one of many "prime contractors" or "prime manufacturers" (also referred to as "Defendant Manufacturers" throughout this lawsuit) who sew the garments before sending them to the Company. The next data field, "17" in this case, is the lot number. Then, comes a short-hand that lays out the type of garment. In this case, the "C" means that this was a "coat"; the "I" shows that it was a "type 1" (non-fire resistant and made of Nylon and Cotton); and the "S" is short for "sample"—hence "CIS." The next four digits denote the date of the batch. Here, "0808" means August 8. The next piece of information identifies the garment. In this case, "A3" means that it was the third garment in the lot. Finally, the last two letters signify from where the punch came from—"MB" means "middle back," "FL" means

18

"front left," and "FR" means "front right." The next column, "Specimen #" identifies the specific punches from the garment.

c. Page one also correctly lays out the permitted permethrin levels for Type I, Class 2 garments (Min: 0.095mg/cm²; Max: 0.135mg/cm²) and for Type III, Class 2 garments (Min 0.095mg/cm²; Max: 0.140mg/cm²).

d. The first page of Exhibit E is essentially a summary. But it's far from benign. The Company attaches this page to the DD 1222 form, which is a cover sheet for submitting information to the government, and sends it to the government as proof that it has properly tested the garments' permethrin levels. However, the data underlying these lab reports is not what the Company is actual reporting.

e. Exhibit E shows how Defendants' committ fraud. The first thing to note on page two is that the garments, from top to bottom, are grouped in threes. By looking in the "Client ID" column, the reader can see that rows 1-3 contain punches (specimens) from garment (sample unit) A1. Row 1 is the middle back punch, row 2 is the front left punch, and row 3 is the front right punch. Continuing down the page, rows 4-6 contain punches from garment A2; rows 7-9 contain punches from garment A3; rows 10-12 contain punches from garment A4; and rows 13-15 contain punches from garment A5.

f. The next critical columns are the two furthest to the right. The second-to-the-right column contains permethrin levels for each individual punch. The column all the way to the right gives an average every three rows, and that number is the average for the three punches from each particular garment. For example, the third row contains 0.062, which is the

19

average of the permethrin levels for the individual punches in rows 1 (0.066 for A1-MB), 2 (0.056 for A1-FL), and 3 (0.063 for A1-FR).

g. Garment (sample unit) A1 fails by every measure. First, the average permethrin level for the three punches (specimens) is 0.062, which is well below the allowed 0.095. Second, more than one of the punches is below the 0.095, which automatically disqualifies it. Third, the second punch (A1-FL) is below the minimum 0.060 threshold, meaning the entire garment automatically fails. Light red highlights in the "mg/cm$^2$" column and in the "AVG" (mg/cm$^2$) column correspond with numbers below 0.095 and above 0.135.

h. Garments A1, A2, A3, A4, and A5[2] are all failures when tested by CompuChem on August 9, 2018. CompuChem reported those failures to the Company on August 10, 2018. These dates are clear on the top of page 2.

i. At this stage, Defendants were allowed one re-test from *different* garments (sample units). A1, A2, A3, A4, and A5 should not reappear at CompuChem for testing on this lot because CompuChem already ran the maximum number of punches (specimens) and those garments failed.

j. But page 3 shows that the Company sent A1, A2, A3, and A4 back for another round of testing. According to this document, on August 13, 2018, CompuChem received garments A1 (rows 1-3), A2 (rows 4-6), A3 (rows 7-9), and A4 (rows 10-12) from the Company. Now not only are they from the same garments, they are the same punches

---

[2] A5's average for the three tested punches is not shaded red like the other failing scores because the number in the chart is 0.095, which would be a passing score if it was the true number. However, the actual average of the three punches is 0.09433333, which falls below the permitted average—CompuChem rounded up to 0.095.

(specimens) as well; these are the "adjacent punches." For example, on August 9, 2018, CompuChem analyzed A1-MB (garment A1, punch from middle back), A1-FL, and A1-FR. On August 13, 2018, it analyzed A1-MB, A1-FL, and A1-FR a second time. At this point, Defendants have also violated the DOD's garment permethrin testing guidelines by re-testing the same garments from the same lot.

k. But it gets worse. On page 3, it is clear that A1, A2, A3, and A4 *all fail a second time* upon being re-tested. However, in order to falsely concoct a passing test, CompuChem combines favorable punch (specimen) scores from its August 9 analysis with those from August 13.

l. This mixing and matching is apparent at the bottom of page three. The bottom three rows are dedicated to garment A4 and, separated by two rows above that, are three rows dedicated to A3. Here, the first—"Sample"—column will be important. In the column, and in the first A3 row, the reader can see 1808014-07. Turning pack to page two, Sample 1808014-07 corresponds with an individual punch (here, MB or middle back) figure of 0.097 for garment (sample unit) A3. The same exact data from this row from the August 9 analysis has been copied and pasted on page 3 (the August 13 analysis). It was then combined with the two most favorable A3 results above—Sample 1808019-08 (A3-FL) at 0.100 and Sample 1808019-09 (A3-FR at 1.46). By taking the three most favorable A3 punches from two different rounds of analysis and combining them, the average comes out to 0.114 mg/cm². *This combination of the most favorable A3 August 9 and August 13 readings is what is reported on page 1*. Below this, CompuChem does the same exact combination trick for garment A4.

21

m. This is fraud. Garments A3 and A4 each failed the permethrin test twice. Aside from blatantly ignoring the DOD's guidelines, the Company covers-up the failed tests by artificially combining punch scores to get to a passing grade that it can then report to the federal government.

n. To continue, page four shows that on August 17, 2018, CompuChem received another set of punches from the Company, which it analyzed on that same day. This garment, A6, failed because the average permethrin level from the three punches came out to 0.091 $mg/cm^2$.

o. On the final page, page 5, it appears that CompuChem received punches from two more garments (A7 and A8) from the Company on August 23, 2018. A7 fails, but A8 passes. The Company now has a third garment to add to the summary of this lot.

p. In summary, the Company only reported to the federal government that, from lot 17, garments A3, A4, and A8 were tested and those garments contained permethrin levels within the DOD's permitted range. **In reality, only A8 passed inspection.** A3 and A4 failed twice even though Defendants listed them as passing. A1, A2, A5, A6, and A7 also failed. Defendants pulled eight garments from lot 17 and, of those eight, only one truly contained the allowed level of permethrin.

66. To continue with the documents, Exhibit F is a photograph that Emmy took at the workplace that shows "seconds." A second is a garment that is discarded after it is assembled due to manufacturing and/or fabric flaws. The Company told its prime contractors to send its seconds to use for permethrin testing so the Company wouldn't have to pull garments from the actual lots of garments going to the Army. In this photograph, the seconds are from Pentaq

22

Manufacturing Corp., and the labels are detailed to let the Company know from where the seconds came so it could report those garments for testing. Testing seconds instead of the actual garments and passing off the results as if they are from the garment lots actually going to the Army is also blatantly fraudulent.

67. Exhibit G is another photograph that Emmy took, and this shows boxes of seconds as well. Exhibit H is another photograph and it shows the same boxes. The writing on the boxes is clearer here, and it says "samples for testing."

68. Exhibit I also shows a form of accounting method related to using seconds for testing. The boxes that Emmy took pictures of are "seconds" or just surplus boxes. The pluses and minuses relate to how many are put in the box and how many are taken out. This would be strictly for testing. The Company could work the system if it didn't want to pull a garment from a lot, often at the direction of on of the Manufacturer Defendants (also, at times, referred to as a "primary"), it could test from the box.

69. Exhibit J contains a substantial number of documents that will likely prove invaluable to this case. For example, it contains a substantial number of uniform inspection forms that were submitted to the government. They are stamped "Passed" and, notably, do not include the underlying spreadsheets that would likely show that a significant number did not actually pass inspection. This large cache of documents contains what Defendants actually transmitted to the government, and it is clear that the CompuChem spreadsheets described above (which show the failed tests) are omitted.

70. Exhibit K is a unisex Army combat uniform. It remains in its plastic bag, as it was sent by Goodwill Industries of Southern Florida, Inc. and/or Bluewater Defense Inc., which can

23

be seen on the white label. It is a destruction lab sample that was meant to be improperly tested by the Company. There exists no other legitimate reason to send such a uniform separately from the lot than to impermissibly test it.

## V. ACTIONABLE CONDUCT

### A. The Federal False Claims Act.

71. This is an action to recover damages and civil penalties on behalf of the United States and Relator Downs arising from the false and/or fraudulent claims, statements, and acts of Defendants made and caused to be made in violation of the False Claims Act (FCA), 31 U.S.C. §§3729–3732.

72. Based on the relevant FCA provisions, Relator Downs, on behalf of the United States Government, seeks through this action to recover damages and civil penalties arising from Defendants' submission and/or causation of the submission of false claims to the federal government.

73. The FCA provides that any person who:

A. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

B. knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . .

is liable to the government for a civil penalty of not less than $10,781 and not more than $21,563 for each such claim plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.

24

31 U.S.C. §3729(a)(1).

74. Any person who violates the FCA is liable for three times the amount of damages that the government sustains because of the act of that person.

75. The FCA defines "claim" as:

A. mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

i. is presented to an officer, employee, or agent of the United States; or

ii. is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

I. providers or has provided any portion of the money or property requested or demanded; or

II. will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. §3729(b)(2) (2011).

76. The FCA allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court of themselves and of the United States Government and to share in any recovery as authorized by 31 U.S.C. §3730 (2011).

**B.** **Defendants Submitted False and/or Fraudulent Claims for Payment or Approval.**

77. Defendants submitted and/or caused the submission of false and/or fraudulent claims for payments to the DOD. Those false and/or fraudulent claims for payment include, but are not

25

limited to, permethrin treatment of Army uniforms that does not comport with the DOD's specifications and requirements on how that treatment is to be conducted.

78. Defendants' claims were false. They represented to the government that garments passed inspection when, in fact, they had not.

79. The DOD would not have paid on Defendants' false claims had it known about the false claims. The DOD's testing specifications set forth in Exhibits B, C, and D are lengthy and incredibly specific. Moreover, the spread of insect-born illnesses, infections, and diseases—like the Zika virus—are of great concern, and it would be illogical to assume that the government would have contracted for uniform treatment with Defendants to keep armed service members safe from such health issues and still paid Defendants if it had known that Defendants were not testing the uniforms, leaving members of the Army unknowingly exposed to serious health conditions.

80. As detailed thoroughly above, Defendants had knowledge of their own fraud. Their scheme to save and make money through failing to properly test the uniforms was multifaceted. Defendants' fraud was also flagrant; their deviation from the DOD's testing standards was brazen and open.

81. As a result of Defendants' submission of false and/or fraudulent claims for payment, Defendants have received significant sums of money to which they are not legitimately entitled. The United States has suffered substantial damages as a result.

**C.** **Defendants Made, Used, and/or Caused to be Made or Used, False Records and/or Statements Material to False or Fraudulent Claims.**

82. Defendants made, used, and/or caused to be made or used, false records and/or statements material to false or fraudulent claims in order to be reimbursed by submitting fraudulent Army uniform permethrin testing reports to the DOD as outlined above.

83. The DOD would not have paid on Defendants' false claims had it known about the false claims. The DOD's testing specifications set forth in Exhibits B, C, and D are lengthy and incredibly specific. Moreover, the spread of insect-born illnesses, infections, and diseases—like the Zika virus—are of great concern, and it would be illogical to assume that the government would have contracted for uniform treatment with Defendants to keep armed service members safe from such health issues and still paid Defendants if it had known that Defendants were not testing the uniforms, leaving members of the Army unknowingly exposed to serious health conditions.

84. As detailed thoroughly above, Defendants had knowledge of their own fraud. Their scheme to save and make money through failing to properly test the uniforms was multifaceted. Defendants' fraud was also flagrant; their deviation from the DOD's testing standards was brazen and open.

85. As a result of Defendants submission of false and/or fraudulent claims for payment, Defendants have received significant sums of money to which they are not legitimately entitled. The United States has suffered substantial damages as a result.

27

**D.**    **Defendants Conspired to Do That Listed Above.**

86. In performing the acts described above, Defendants individually by and through their own acts, or through the acts of their agents, servants, officers, and employees, knowingly conspired to present or make, use, and/or cause to be made or used, false records or statements material to false or fraudulent claims paid or approved by the DOD.

87. The DOD would not have paid on Defendants' false claims had it known about the false claims. The DOD's testing specifications set forth in Exhibits B, C, and D are lengthy and incredibly specific. Moreover, the spread of insect-born illnesses, infections, and diseases—like the Zika virus—are of great concern, and it would be illogical to assume that the government would have contracted for uniform treatment with Defendants to keep armed service members safe from such health issues and still paid Defendants if it had known that Defendants were not testing the uniforms, leaving members of the Army unknowingly exposed to serious health conditions.

88. As detailed thoroughly above, Defendants had knowledge of their own fraud. Their scheme to save and make money through failing to properly test the uniforms was multifaceted. Defendants' fraud was also flagrant; their deviation from the DOD's testing standards was brazen and open.

89. As a result of Defendants conspiracy, Defendants have received significant sums of money to which they are not legitimately entitled. The United States has suffered substantial damages as a result.

Case 1:19-cv-01026-JEP    Document 1    Filed 10/01/19    Page 28 of 32

## FIRST CLAIM FOR RELIEF
## (FALSE CLAIMS—31 U.S.C. §3729(a)(1)(A))

90. The allegations of all paragraphs in this Complaint are incorporated by reference.

91. In performing the acts described above, Defendants individually by and through their own acts, or through the acts of their agents, servants, officers, and employees, knowingly presented, and/or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payments or approval by the U.S. government, in violation of 31 U.S.C. §3729(a)(1)(A).

92. As a result of the Defendants' fraudulent conduct, the United States government has been damaged in amounts to be determined at trial.

93. Additionally, the United States is entitled to penalties of up to $11,000 for reach and every violation of 31 U.S.C. §3729(a)(1)(A) by the Defendants that were committed before November 2, 2015.

94. Additionally, the United States is entitled to penalties of up to $21,563 for reach and every violation of 31 U.S.C. §3729(a)(1)(A) by the Defendants that were committed after November 2, 2015.

## SECOND CLAIM FOR RELIEF
## (FALSE STATEMENTS—31 U.S.C. §3729(a)(1)(B))

95. The allegations of all paragraphs in this Complaint are incorporated by reference.

96. In performing the acts described above, Defendants individually by and through their own acts, or through the acts of their agents, servants, officers, and employees, knowingly made, used, and/or caused to be made or used, false records or statements material to false or

29

fraudulent claims paid or approved by the U.S. government, in violation of 31 U.S.C. §3729(a)(1)(B).

97. As a result of the Defendants' fraudulent conduct, the United States government has been damaged in amounts to be determined at trial.

98. Additionally, the United States is entitled to penalties of up to $11,000 for reach and every violation of 31 U.S.C. §3729(a)(1)(B) by the Defendants that were committed before November 2, 2015.

99. Additionally, the United States is entitled to penalties of up to $21,563 for reach and every violation of 31 U.S.C. §3729(a)(1)(B) by the Defendants that were committed after November 2, 2015.

### THIRD CLAIM FOR RELIEF
### (CONSPIRACY—31 U.S.C. §3729(a)(1)(C))

100. The allegations of all paragraphs in this Complaint are incorporated by reference.

101. In performing the acts described above, Defendants individually by and through their own acts, or through the acts of their agents, servants, officers, and employees, knowingly conspired to present or make, use, and/or cause to be made or used, false records or statements material to false or fraudulent claims paid or approved by the U.S. government, in violation of 31 U.S.C. §3729(a)(1)(C).

102. As a result of the Defendants' fraudulent conduct, the United States government has been damaged in amounts to be determined at trial.

30

103. Additionally, the United States is entitled to penalties of up to $11,000 for reach and every violation of 31 U.S.C. §3729(a)(1)(C) by the Defendants that were committed before November 2, 2015.

104. Additionally, the United States is entitled to penalties of up to $21,563 for reach and every violation of 31 U.S.C. §3729(a)(1)(C) by the Defendants that were committed after November 2, 2015.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator Downs, on behalf of herself and the United States Government, prays as follows:

1. That for violations of the Federal False Claims Act, 31 U.S.C. §3729, *et seq.*, this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729 committed before November 2, 2015, and a civil penalty of $21,563 for each violation of 31 U.S.C. §3729 committed after November 2, 2015;

3. That Relator Downs be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d), including the costs and expenses of this action and reasonable attorneys' fees;

5. That a trial by jury be held on all issues; and

6. That the United States Government and Relator Downs receive all relief, both in law and equity, to which they reasonably be entitled.

31

This the 26th day of September, 2019.

Respectfully Submitted,

Sean F. Herrmann (NC Bar No. 44453)
sean@herrmannmurphy.com
Kevin P. Murphy (NC Bar No. 41467)
kevin@herrmannmurphy.com
Herrmann & Murphy, PLLC
1712 Euclid Avenue
Charlotte, North Carolina 28203
Phone: (704) 940-6399
Fax: (704) 940-6407
*Attorneys for Relator*

32