**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EMELIA DOWNS, <br><br> Plaintiff, <br><br> v. <br><br> INSECT SHIELD, LLC and the ESTATE of RICHARD LANE, <br><br> Defendants. | No. 1:19-CV-1026 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT IN INTERVENTION**

The United States of America (hereinafter "United States" or the "Government") brings this action against Insect Shield, LLC ("Insect Shield") and the Estate of Richard Lane ("Lane"), Insect Shield's founder, former majority owner, and Chief Operating Officer, pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, for treble damages and civil penalties. For its Complaint in Intervention, the United States of America alleges as follows:

**INTRODUCTION**

1.      This action arises from a knowing, multi-year failure by Insect Shield and its founder, majority owner and former chief operating officer, Richard Lane, to apply permethrin, an insect repellant, to Army Combat Uniforms and Improved Hot Weather Combat Uniforms (collectively "ACUs" or "combat uniforms"), within contractually required concentration levels, and their knowing failure over many years to truthfully and

accurately report laboratory test results that would have revealed these repeated failures to the Government.

2. Beginning in 2013 and continuing through today, the Defense Logistics Agency (DLA) and the Department of the Army ("Army") have awarded multiple contracts to clothing manufacturers to purchase permethrin-treated ACUs to protect soldiers from dangerous diseases that they might encounter while serving their country. Various ACU manufacturers used Insect Shield to perform the permethrin treatment specified by their federal prime contracts.

3. The contracts required the prime contractors to provide ACUs with permethrin treatment at a concentration within specified limits. The contracts further required the prime contractors to demonstrate their conformance with contract requirements by having an Army-approved laboratory perform testing to measure the level of permethrin on the garments and required them to certify that the test results met the requirements for permethrin application. The prime contractors assigned these responsibilities to Insect Shield.

4. From at least 2015 through at least 2021 (the "relevant time period"), when permethrin test results showed that Insect Shield's permethrin treatment failed to meet the contract requirements, Insect Shield and Lane falsified test results in various ways, including by inappropriately combining results from different rounds of testing to give the appearance of passing tests, re-labeling test samples (pulled from different lots or excess stock instead of the treated lot) to hide the true origin of the samples, and performing re-

2

tests of combat uniforms in excess of what the contracts permitted. Insect Shield then falsely certified to the Defense Contract Management Agency (DCMA) and DLA its compliance with the permethrin application and testing requirements by signing Certificates of Conformance for uniform lots for which it had falsified test results.

5.     Defendants' knowing, material, and repeated false certifications along with their false records and statements caused false claims to be submitted to the Government for ACUs that were not treated or tested in accordance with the contract requirements.

6.     The actions of Insect Shield and Lane deprived the Department of Defense— and its soldiers—from receiving ACUs with a known level of permethrin within the range specified in the contracts.

## JURISDICTION AND VENUE

7.     This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729–3733. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345.

8.     This Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants transact business or reside in the Middle District of North Carolina.

9.     Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) because Defendants transact business or reside in this District, and a substantial part of the events giving rise to this action occurred in this District.

10.    Pursuant to 28 U.S.C. § 2404, the United States' claim against Richard Lane is enforceable against his estate.

## PARTIES

11.    The United States brings this action on behalf of the United States Department of Defense (DoD), with affected agencies and departments including the Defense Logistics Agency, the Defense Contract Management Agency, and the Department of the Army.

12.    Defendant Insect Shield, LLC is a North Carolina Limited Liability Company with its principal place of business located in Greensboro, North Carolina.

13.    Defendant Richard Lane was a resident of Guilford County, North Carolina. During the time period of the allegations in this complaint, Lane was the founder, majority owner and Chief Operating Officer of Insect Shield.  Lane died in December 2022.

## LEGAL AND REGULATORY BACKGROUND

### The False Claims Act

14.    The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(a)(1)(C) conspires to commit a violation of subparagraph (A) [or] (B) …

is liable to the United States for three times the amount of damages which the Government sustains, plus a civil penalty per violation. 31 U.S.C. § 3729(a). For violations occurring

4

between September 28, 1999 and November 1, 2015, the civil penalty amounts range from

a minimum of $5,500 to a maximum of $11,000. *See* 28 C.F.R. § 85.3; 64 Fed. Reg. 47099,

47103 (1999). For violations occurring on or after November 2, 2015, the civil penalty

amounts currently range from a minimum of $13,508 to a maximum of $27,018. 28 C.F.R.

§ 85.5.

15.    For purposes of the FCA,

> the terms "knowing" and "knowingly" (A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. . . .

31 U.S.C. § 3729(b)(1).

16.    The FCA defines "material" to mean "having a natural tendency to influence,

or be capable of influencing, the payment or receipt of money or property." 31 U.S.C.

§ 3729(b)(4).

## FACTS

### A. DoD Contracts with Garment Manufacturers to Provide Permethrin-Treated Army Combat Uniforms

17.    The Army started contracting with multiple garment manufacturers in 2013

to supply the Army with permethrin-treated ACUs. DLA thereafter entered into similar

contracts. The ACUs include coats and trousers of different fabric types, and some combat

uniforms treated with permethrin are Improved Hot Weather Combat Uniforms

(IHWCUs).

5

18.     All Army personnel have been required to wear permethrin-treated combat uniforms since at least 2013. To protect its soldiers against biting insects and associated vector-borne diseases, such as malaria and Lyme Disease, the Army's pest management and personal protection directives included the use of permethrin-treated combat uniforms. The Army generally does not use untreated combat uniforms for its personnel, with the exception of maternity uniforms and a few infrequent special orders.

19.     The Army Public Health Center explains that "The key to preventing diseases transmitted by insects (such as malaria and West Nile virus spread by mosquitos and Lyme disease spread by ticks) is the simultaneous use of all elements of the DoD Insect Repellant System" and "[w]earing permethrin-treated uniforms is a key component of this system." It further explains that factory-treating ACUs with permethrin is an improvement to the previous status quo—soldiers spraying their own uniforms with insect repellent—because:

> The factory treatment uses special binders to ensure that enough permethrin is retained in the uniform's fabric to protect against mosquito, tick, fly, chigger, and midge bites for the lifetime of the uniform. **Factory treatment guarantees that a safe and effective amount of permethrin is precisely applied to each ACU [. . .].** The guesswork about who is protected by a permethrin treated uniform is removed. Factory treatment eliminates the potential risk of increased exposure to Soldiers applying concentrated liquid permethrin products to their uniforms. Factory treatment also eliminates environmental concerns associated with the use and disposal of field-applied permethrin products.

Army Public Health Center, *Permethrin Factory-Treated Army Combat uniforms*, Fact Sheet 18-076-0317 (emphasis added).

6

20.     For most contracts for permethrin-treated ACUs, DLA oversaw the solicitation and award process, monitored quality requirements, and monitored any issues with contractors or subcontractors. The Army handled these responsibilities for itself on other ACU contracts.

21.     DCMA handled the day-to-day management and administration of contract performance and implementation, including assessing through lot inspections whether a garment conformed to the contract requirements.

22.     DLA specified the requirements for the ACUs in Purchase Descriptions written by the Army, and in "Technical and Quality Requirements for the Unisex ACU Coats and Trousers Contracts" ("Technical and Quality Requirements"), which function as a supplement to the Purchase Descriptions.  The Purchase Descriptions and the Technical and Quality Requirements were incorporated into solicitations by reference.

23.     Slightly different Purchase Descriptions exist for coats, trousers, Improved Hot Weather Combat Uniform (IHWCU) coats, and IHWCU trousers. The Army periodically updates the Purchase Descriptions, and DLA incorporates any updates into active solicitations and awards.

24.     Between 2013 through today, DLA and the Army ultimately awarded contracts (which incorporated the Purchase Descriptions and Technical and Quality Requirements) for the manufacturing of ACUs to several different prime contractors, including but not limited to Pentaq Manufacturing Corp., Bluewater Defense, Inc., Goodwill Industries of South Florida, Inc., National Industries for the Blind, Excel

Garment Manufacturing, Ltd., and Tullahoma Industries, LLC. A list of the contracts in effect during the relevant time period is attached as Exhibit A.

25. Each of these manufacturers, as prime contractors, arranged for Insect Shield to perform permethrin treatment on the ACUs. The contracts at issue in this matter listed Insect Shield's facility in North Carolina as an allowable place of performance for the permethrin treatment. The ACU manufacturers shipped the ACUs to Insect Shield, and Insect Shield applied the permethrin to the ACUs at its facility in North Carolina and conducted the contractor verification testing for permethrin levels.

## B. The Contracts Contained Detailed Permethrin Treatment and Testing Requirements to Protect Soldiers.

26. To ensure that the ACUs delivered under the contracts had the contractually specified amount of permethrin applied uniformly over the entire garment, the contracts, through the incorporated purchase descriptions, contained detailed requirements for the permethrin treatment and subsequent permethrin-level testing, which Insect Shield used a third-party laboratory to perform. While slightly different contracts exist for coats, trousers, IHWCU coats, and IHWCU trousers, the permethrin testing and reporting requirements are materially similar in each contract and are described in more detail below.

27. Permethrin is a member of the pyrethroid class of pesticides. Permethrin is registered by the U.S. Environmental Protection Agency (EPA) as an insecticide for use in a variety of applications, including insecticide-treated clothing, both commercial and military. EPA first registered permethrin factory-treated clothing products for consumers

8

in 2003. EPA regulates permethrin registrants under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).

28.    The Purchase Descriptions for all of the contracts at issue incorporated FIFRA and required FIFRA compliance and EPA registration. FIFRA and other federal laws require that a company must obtain a registration from EPA before distributing a pesticide.  Before registering a new pesticide or new use for a registered pesticide, the EPA must first ensure that the pesticide meets the safety standard set by the law.

29.    The Purchase Descriptions required that garments bear an insect protection label in compliance with the approved EPA registration. The label is required to list an active ingredient of permethrin at a percentage weight of 0.52% (with the garment accounting for 99.48% of the weight).

30.    The Purchase Descriptions required that the permethrin treatment provide insect bite protection at minimum thresholds varying by garment type. In addition, the permethrin finish must be uniformly applied across the garment and strictly controlled to ensure that the permethrin concentration is within the allowed range.

31.    The Purchase Descriptions required permethrin to be within a specified range, depending on fabric type and uniform type (ACU or IHWCU).  For example, in GL/PD 14-04A and 14-05A, which applied to standard ACUs, the allowed range of permethrin concentration after initial treatment was from 0.095–0.135 $mg/cm^2$ for Type I fabrics (50/50 Nylon/Cotton Ripstop).

32.     To confirm whether the garments fell within the allowed range of permethrin, the Purchase Descriptions required permethrin content analysis (known as contractor verification testing) through a comprehensive test method performed by a laboratory approved by the Army.

33.     For each manufacturing lot, the Purchase Descriptions required that garments be selected for permethrin verification testing and that test fabric samples be cut from each test garment. For example, Purchase Descriptions GL/PD 14-04A and 14-05A required a test sample size of three sample units (garments), unless otherwise noted in a contract or purchase order.

34.     The Army-approved laboratory then tested the permethrin concentration of the ACU fabric samples using calibrated equipment. Once test results were complete, the permethrin concentrations for all sample garments tested were required to be reported.

35.     Of the three fabric samples for a particular garment, one—and only one—fabric sample was allowed to fall outside the allowed permethrin concentration range, so long as the average of the three fabric samples does fall within the allowed range.

36.     In other words, a garment could fail the permethrin content analysis in one of two ways: (1) if more than one of the three fabric samples fell outside the allowed range, or (2) if the average of the three fabric samples fell outside the allowed range.

37.     If a garment failed permethrin-level testing, the Purchase Description allowed for one additional garment to be pulled for testing. That test was then used to rate whether the lot passes or fails permethrin content analysis testing.

38.     The Technical and Quality Requirements, which are promulgated by DLA and incorporated into the contracts, reiterated that the permethrin testing shall be performed in accordance with the relevant Purchase Description and contract provisions for verification of permethrin treatment.

39.     The Technical and Quality Requirements mandated that all testing data be recorded on a lab report signed by the testing lab that included all results from each sample tested. That lab report was then provided to DCMA's Quality Assurance Representative (QAR) and forwarded to DLA Troop Support and the Textile Materials Evaluation Team.

40.     During the relevant time period, two complete "Manufacturing Lots" could generally be combined into a single "Treatment Lot" so long as the lots were the same print, type of fabric, and garment style (e.g., coat or trouser).

41.     If different manufacturing lots were combined for permethrin treatment, the contracts still required permethrin verification testing to be completed and reported for each manufacturing lot.

## C. Insect Shield's Application of Permethrin to Army Combat Uniforms

42.     Insect Shield was founded by Lane in 2001 to apply permethrin to consumer apparel.

43.     Insect Shield does not manufacture garments.  Instead, it applies permethrin to garments manufactured by other companies. Insect Shield has both a commercial business line (where it applies permethrin to garments sold directly to consumers, through

11

their own store or on behalf of other commercial manufacturers) and a military business line (where it applies permethrin to military combat garments).

44.    Insect Shield is one of only two government subcontractors that treat ACUs with permethrin.  The manufacturers ship the ACUs to Insect Shield (or to the other subcontractor) for permethrin treatment.

45.    Insect Shield works with CompuChem, an Army-approved outside laboratory, to conduct the permethrin concentration testing via gas chromatography/mass spectrometry (GC/MS) according to contractual specifications. Insect Shield provided specialized laboratory equipment that it owned to CompuChem as part of the testing arrangement.

46.    Insect Shield took die-cut punches (three inches in diameter) from the sample garments and sent those punched fabric samples to CompuChem to perform the permethrin-level testing.

47.    For each lot of garments treated, CompuChem provided all test results to Insect Shield, often including Richard Lane, in an Excel spreadsheet sent via email. At Insect Shield's direction, CompuChem also prepared and sent to Insect Shield a chart showing results for passing tests but excluding all of the failing tests. Insect Shield only shared the chart of passing results with the Government and did not share the spreadsheet containing all of the results, both passing and failing.

12

48.     Insect Shield also prepared and signed a Certificate of Conformance stating that test results attached to the certificate met the relevant purchase description's requirements for permethrin application.

49.     After the ACUs were treated by Insect Shield and the permethrin testing and paperwork were completed, the DCMA QAR then traveled to Insect Shield to perform a brief inspection of a sample of the combat uniforms in the lot. The QAR's inspection of these sample garments included verification that the garments were not damaged during treatment (*e.g.*, missing buttons, ripped fabric) and still met the measurements required in the contract (*e.g.*, verify that the garment did not shrink). The QAR also verified that the lot paperwork was completed and that the Certificate of Conformance was signed.

50.     Following the QAR's review, Insect Shield shipped the ACUs, generally to DLA third-party logistics centers, and then sent the Certificate of Conformance and the chart of passing test results to the Government for each shipment. The Government then remitted payment to the prime contractors.  Insect Shield received payment from the prime contractor for its permethrin treatment of the ACUs after the prime contractors received payment.

**D.  Insect Shield's and Lane's Fraudulent Schemes**

51.     Insect Shield and Lane were aware of the contents of the Purchase Descriptions and understood that, as a subcontractor acting on behalf of the prime manufacturers, Insect Shield was required to comply with the contract requirements with respect to permethrin treatment and testing. Lane and other Insect Shield employees and

managers communicated directly with DLA and DCMA regarding the contract requirements. In fact, Lane commented to Insect Shield employees that he thought the testing requirements were too rigorous.

52. Conducting testing through CompuChem was time-consuming. Even if all garments passed in the first round of testing, Insect Shield might not have results for three or more days after CompuChem received the garments.

53. Moreover, sometimes the samples originally provided to CompuChem did not yield passing results. Any retest would require additional time for testing.

54. Manufacturing lots could not be approved and shipped to the Government unless and until permethrin verification testing results were complete. The manufacturers, as the prime contractors, did not get paid for ACUs until the Government received the ACUs. Accordingly, there was pressure for Insect Shield to expedite the test process.

55. Furthermore, if a lot failed CompuChem's permethrin verification testing, the DCMA Quality Assurance Representative was required to refuse the lot.

56. Test failures were not uncommon at Insect Shield beginning at least as early as 2014. "Receive failing [test] results" is written into Insect Shield's internal workflow diagram. Insect Shield employees notified Lane of failing test results to obtain his direction on how to proceed.

57. On September 16, 2016, Insect Shield's Director of Military Programs, Michael Corley, described the company's test results as "erratic." Insect Shield's Chief Financial Officer, Aaron Holcomb, replied that "we test more for safe guard, however

14

when they all fail doesn't do us any good. . . it's the process that we do it and we are unable to track back to understand why its happening."

58.     Insect Shield and Lane did not disclose the "erratic" test results or failures to the Government.

59.     Insect Shield's issues with "erratic" test results and test failures continued long past 2016.

60.     In January 2018, CFO Holcomb "did a quick statistical review" of Insect Shield's testing in 2017. He reported to Lane and to Haynes and Jason Griffin that Insect Shield sent "just under 7,000 samples" to CompuChem for testing, for "less than 550 lots." This amounts to testing 12.73 garments per manufacturing lot. The Purchase Descriptions, by contrast, allowed three tests and a single retest upon failure, or a maximum of four garments tested per manufacturing lot. Meanwhile, in its certifications to the Government, Insect Shield only reported results from, at most, three garments per manufacturing lot, concealing the repeated failing results.

61.     Insect Shield reported few, if any, test failures to the Government between 2015 and 2021. For example, during 2017—and consistent with its longstanding practice of manipulating the permethrin test process and concealing test failures—Insect Shield did not report a single test failure to the Government, even though it experienced many test failures.

62.     Throughout their relationship with the Government, Insect Shield and Lane used multiple methods to conceal their test failures, circumvent the Government's

contractual testing requirements, and continue pushing out combat uniforms as quickly as possible.

> i. Insect Shield Failed to Follow the Retesting Procedure, Falsely Re-Labeled Samples, and Concealed Failing Test Results

63.     Insect Shield failed to follow the contractual requirements for failed test results and instead retested additional samples over and over again until it had obtained sufficient passing results to present to the Government. Contrary to contractual requirements, Insect Shield then presented a table of only passing results to the Government, omitting any failing results.

64.     Insect Shield and Lane devised multiple fraudulent techniques to get CompuChem to report a table of passing test results, none of which are permitted by the contracts.

65.     First, for each garment it tested, instead of taking three fabric samples as the Purchase Descriptions required, Insect Shield, at Lane's direction, took six fabric samples. It called the additional set of three fabric samples "adjacents." Rather than obtain one additional random garment from the treatment lot upon a test failure, as the Purchase Descriptions required, Insect Shield substituted "adjacents" from the already tested garments for retests. Insect Shield stored the "adjacents" from prior test garments at its facility, which enabled Insect Shield to pull old "adjacents" from prior lots if they needed more fabric samples for testing.

66.     Because the Government does not pay for garments that have portions removed for testing, using "adjacents" instead of a new garment allowed Insect Shield to

16

avoid destroying additional permethrin-treated ACUs for which the manufacturer would ultimately not get paid. Lane touted this cost savings to manufacturers.

67.     Oftentimes the "adjacents" would fail the retesting as well.

68.     When "adjacents" from the lot to be tested failed, Insect Shield used "adjacents" from other lots, from excess stock, or from additional second quality garments (garments that contain defects, also known as "seconds") that manufacturers had provided, in an attempt to obtain passing results to put on a report. These test fabric samples did not provide valid test results because they did not come from the same manufacturing lot or even the same treatment lot as the lot that Insect Shield was purported to be testing.

69.     For example, on April 29, 2016, Insect Shield's quality control coordinator sent an email to CompuChem asking, "If you didn't use the adjacents for the BWD-110, is there any way that you could run them as adjacents for GDW-15, 31, 32, 33?"[1] In other words, Insect Shield requested that CompuChem use extra fabric samples (the adjacents) from Bluewater Lot 110 to purportedly obtain, and report, test results for four Goodwill lots.  Each of these improperly substituted test samples (the adjacents) was falsely labeled and reported as though it was a fabric sample from the original test lot.

70.     Another example of Insect Shield improperly falsely labeling and substituting test samples is shown in the picture below. This picture shows a sticky note that was attached to lot paperwork for Insect Shield to track which "adjacent" samples had

---

[1] Insect Shield referred to its lots by manufacturer and manufacturing lot number. Here, BWD-110 refers to Bluewater Defense Lot 110 and GDW-15 refers to Goodwill Lot 15.

17

been used for that round of testing. Insect Shield noted that it had taken the "adjacent" from sample A2 and falsely relabeled it as A1 for the retest because Insect Shield knew the original A2 sample passed the first round of testing, whereas the true A1 sample did not pass. Insect Shield similarly noted that it had done the same thing with "adjacent" A3, relabeling it as A4. The purported "A1" and "A4" results would then be reported as though they had originally passed when they had not.



71. Insect Shield and Lane were aware that relabeling samples from one lot and making it appear as though they were from another lot did not meet the Purchase Description's requirements.

72. At other times, Insect Shield instructed CompuChem to mix-and-match test results following multiple rounds of testing, cherry-picking only passing results from different test specimens to make the final report appear as though all results had passed.

18

73. For example, Insect Shield sent nine fabric punches (from three different garments) from treatment lot TUL-346 to CompuChem for testing on January 31, 2018.

74. CompuChem returned test results to Insect Shield showing that two of the three garments failed testing. A work order number was included at the top of the test report. Under the contract requirements, two garments with failed test results should have immediately caused the entire lot to fail without opportunity for retesting.

75. Insect Shield Program Manager Shannon Ridge sent an email to CompuChem instructing the lab to use the "adjacent" samples (which already had been shipped with the nine original samples) as replacements for the samples that failed testing and to run an additional round of testing.

76. CompuChem tested the adjacent samples and generated a new test report combining the passing results from the one garment from the first round that passed testing with the results from the new round of testing on the adjacent samples. However, all three garments represented by the adjacent samples for treatment lot TUL-346 also failed testing (in fact, seven out of nine samples tested outside the contractual range). CompuChem generated a new work order number for the second round of testing and included both the new and original work order numbers on the new test report provided to Insect Shield.

77. Because CompuChem had already used the adjacent samples, Insect Shield mailed additional garment samples to CompuChem for a third round of testing even though the contracts did not permit a third round of testing. CompuChem tested these additional garments and prepared a third test report mixing passing results from the 1st, 2nd, and 3rd

19

rounds of testing to show that the three garments supposedly passed testing when they had

not. The failing test results were not included on the test report; however, CompuChem

added a third work order number to the top of the final test report showing three rounds of

testing.

78. CompuChem prepared this combined test report at the direction of Insect

Shield Program Manager Shannon Ridge.

79. Insect Shield then prepared and signed a Certificate of Conformance attesting

that the results met the Purchase Description requirements. This certification was

knowingly false and material.



insect ◇ shield
repellent technology

**Certificate of Conformance**

| | | | |
|---|---|---|---|
| Contractor: | Tullahoma Industries | Lot Number: | 346 |
| Contract: | SPM1C1-13-D-1050 | | |
| Order: | 0032 | Lot Size: | 3,476 |
| Item: | ACU OCP Type I, Class 2 Trousers | | |
| Permethrin Level: | Min: 0.095mg/cm2  Max: 0.135mg/cm2 | Spec/Test Method: | GL/PD 14-04A  GL/PD 14-05A |

This lot was combined in treatment following testing requirements of above reference specification with manufacturers lots:

Tullahoma (lots) Lot 347

☒ The attached result meet the requirements of specification GL-PD-07-14D, GL-PD-07-13D, for permethrin application.

☐ The attached result do not meet the requirements of specification GL-PD-07-14D, GL-PD-07-13D, for permethrin application.

| Shannon Ridge | Quality Control Coordinator | *Shannon Ridge* | 2/9/2018 |
|---|---|---|---|
| | Insect Shield Representative Name, Title & Signature | | Date |

20

80.     Ridge presented this false Certificate of Conformance and a false test report purporting to show passing results for lot TUL-346 to the DCMA QAR when the lot was inspected at Insect Shield.

81.     Insect Shield then shipped the garments from this lot to a DLA distribution center.

82.     Tullahoma Industries LLC, the prime contractor, submitted a claim to the Government for payment for lot TUL-346.

83.     The United States paid $144,427.80 on March 5, 2018, for lot TUL-346.

84.     DLA would not have accepted the lot because it did not conform to contractual requirements and would not meet the requirements of the Army, the end user of the combat uniforms. Accordingly, the United States would not have paid for lot TUL-346 had it known that the permethrin testing was not completed in accordance with the contract and that the test results were inaccurate and fraudulent and that the combat uniforms did not meet the permethrin levels specified in the contracts.

85.     Despite these actions, Insect Shield falsely certified to the Government that the results met the requirements of the Purchase Descriptions, and provided the Government with a chart from CompuChem also certifying that the tests shown in the chart were "performed in accordance" with contractual specifications and that the "reported results are true, valid and applicable to the samples tested."

86.     Similarly, Insect Shield failed to follow the proper testing procedure for lot GDW-17 from Goodwill in August of 2018.

21

87. Insect Shield performed four rounds of testing for lot GDW-17, even though the contract only permits one re-test, and then had CompuChem mix and match test results from various rounds to fraudulently show passing results.

88. To accomplish this, Insect Shield relabeled samples from lot GDW-243 and GDW-240 to pretend they came from lot GDW-17.



89. For example, in the above handwritten note, an Insect Shield employee documents that a fabric punch labeled A1 from lot GDW-243 was relabeled as fabric punch A1 for lot GDW-17 even though it did not come from a garment in lot GDW-17. Likewise, a fabric punch labeled A2 from lot GDW-240 was relabeled as fabric punch A7 for lot GDW-17 even though it did not come from a garment in lot GDW-17.

90. Insect Shield then prepared and signed a certificate of conformance on August 21, 2018, attesting that the results met the Purchase Description requirements. This certification was knowingly false and material.

91.     Insect Shield presented this false Certificate of Conformance and a false test report purporting to show passing results for these lots to the DCMA QAR when the lot was inspected at Insect Shield. Insect Shield also e-mailed these documents to DLA on August 24, 2018.

92.     Insect Shield shipped the garments from this lot to a DLA distribution center.

93.     Goodwill Industries of South Florida submitted a claim to the Government for payment for lot GDW-17.

94.     The United States, through the Defense Financial Accounting Service, paid $111,541.30 on October 4, 2018 and $56,388.32 on September 10, 2018 for lot GDW-17.

95.     United States would not have paid for lot GDW-17 had it known that the permethrin testing was not completed in accordance with the contract and that the test results were inaccurate and fraudulent.

ii.     <u>Insect Shield Misrepresented Its Compliance by Testing and Reporting Results for Garments That Were Separately Treated From the Lot of Garments It Actually Provided to the Army</u>

96.     At times, Insect Shield would use garments for testing that were not treated along with the rest of the lot. Prime manufacturers would send garments ahead of the main lot, or Insect Shield would pull garments from excess stock, to be treated and tested, and then falsely reported, as though they had been treated with the lot to be ultimately treated, reported, and sent to the Government.

23



97.     The permethrin verification process is designed to test the permethrin application and concentration in a given lot. A certification with test results from garments that were not actually tested with that lot is worthless.

98.     For example, when multiple samples from lot FPI-SE50 failed in January 2020, Insect Shield used "extras," other "seconds" on hand, and ultimately specimens from lots IOB-BISM-34 and IOB-BISM-35 for retesting.  Insect Shield falsely relabeled those samples as though they were from the FPI-SE50 lot when they were not.

99.     This process violated the retesting procedures required by contract SPE1C1-19-D-F015.

100.    Shannon Ridge signed a Certificate of Conformance for lot FPI-SE50 on January 28, 2020, falsely certifying that the lot's test results were in accordance with the relevant purchase description required by the contract.  Insect Shield presented this false certification and a false test report purporting to show passing results for this lot to DCMA and then sent the false certification to DLA via email on January 29, 2020.

24

101. Federal Prison Industries submitted a claim for payment to the Government for lot FPI-SE50.

102. The Defense Finance Accounting Service paid $227,344.00 on February 24, 2020, for lot FPI-SE50.

103. The government would not have paid for these combat uniforms had it known the testing was not done in conformance with the contract requirements and that the so-called passing results were from samples not manufactured and treated with lot FPI-SE50.

104. As another example, on August 27, 2020, David Brown sent a handwritten memorandum to Richard Lane, along with Insect Shield employees Andy Kennedy and Shannon Ridge regarding Bluewater Defense (one of the prime contractors), stating: "We are going to get the GC [testing] samples for coat Lots 96 & 97 from the excess stock. We will change the lot numbers in the 7 coats as necessary. . . . The samples must be punched today and sent out today for GC testing." The memorandum also notes that Lot 96 "should be here tomorrow" and Lot 97 will "ship tomorrow."

105. In short, rather than testing garments from Bluewater Lot 96 and Lot 97, Insect Shield treated random garments, falsely labeled them as though they came from Lots 96 and 97, sent the false samples for testing, and then falsely reported to the Government that samples from Lots 96 and 97 had passed permethrin level testing.

106. Insect Shield signed a Certificate of Conformance on September 2, 2020, falsely certifying that the lot's test results were in accordance with the relevant purchase

25

description required by the contract. Insect Shield knowingly submitted this false certification, along with the false test results purporting to be from Bluewater Lots 96 and 97 to DCMA, and then sent a copy to DLA via email also on September 2, 2020. This false certification was material to the Government's decision to issue payment.

107. Bluewater Defense submitted a claim to the Government for payment for Bluewater Lots 96 and 97.

108. The Defense Finance Accounting Service made two payments to Bluewater Defense for Lot 96: $166,837.96 on September 28, 2020, and $150.44 on October 6, 2020. Also on October 6, 2020, the Defense Finance Accounting service paid Bluewater Defense $13,313.94 for Bluewater Lot 97.

109. The Government would not have paid for these combat uniforms had it known the testing was not done in conformance with the contract requirements and that the so-called passing results were from samples not manufactured and treated with Bluewater Lots 96 and 97.

**E. Insect Shield and Lane Knowingly Caused Materially False Claims to be Submitted for ACUs**

110. Relator Emelia Downs approached Lane during 2017 about test failures and her concerns that they were not accurately reporting results to the Government and were falsely certifying compliance. Lane instructed Downs never to mention the failed tests to the Government.

111. In early 2018, Downs refused to send the certificates of conformance and test reports to DLA because she knew they were fraudulent. Rather than ceasing its fraudulent

26

conduct, Insect Shield, at the direction of Lane, developed a workaround, shifting those duties to Shannon Ridge.

112.    Insect Shield later took additional steps to conceal its fraud. For example, in January 2020, DLA noticed that the test result tables presented by Insect Shield included multiple CompuChem work order numbers.

113.    DLA then asked Insect Shield personnel, including Lane, why multiple work order numbers existed. Lane falsely told the Government that Insect Shield occasionally had to do a retest due to equipment failures and represented that Insect Shield did not conduct multiple retests due to failing results.

114.    To further conceal its fraud and avoid scrutiny from DLA, Insect Shield instructed CompuChem on January 24, 2020, and on January 28, 2020, to remove work order numbers from future tables it prepared.

## F. Lane Directed Insect Shield's Fraudulent Scheme and Was Intimately Involved in All Aspects of the Permethrin Testing Process

115.    According to Insect Shield's website, Lane was the "creator and developer of the proprietary Insect Shield chemistry and process" and he "designed the required equipment." The website further reflects that Lane received a degree in Textile Chemistry from North Carolina State University.

116.    Lane oversaw all procedures for permethrin testing for garments treated by Insect Shield. Utilizing his background as a textile chemist, Lane developed and maintained the relationship with CompuChem and instructed CompuChem regarding how to create the reports of test results.

27

117.    Lane was familiar with the testing requirements in the contracts, and he made all decisions relating to Insect Shield's testing protocol.  Lane provided copies of the contract documents to Insect Shield and explained the testing requirements. Lane also complained to Insect Shield employees that he thought the testing requirements were too stringent.

118.    Lane communicated with DLA and Army personnel regarding the contract requirements for permethrin testing and treatment. Lane would also sometimes be present with DCMA QARs while they performed their inspection of the garments at Insect Shield's warehouse.

119.    Lane also communicated directly with the prime contractors (garment manufacturers) regarding all aspects of Insect Shield's performance under these contracts including compliance with contractual requirements and arranging prices charged to the prime contractors for Insect Shield's application of permethrin.

120.    Lane established the process and protocols for Insect Shield's preparation of fabric samples for permethrin testing, including the use of the "adjacent" fabric samples. Sometimes Lane would even personally deliver the "adjacents" to CompuChem himself to expedite the testing process.

121.    Lane instructed Insect Shield employees to relabel fabric test samples to falsely represent the origin of those samples.

122.    Lane also instructed Insect Shield employees to deviate from the testing process required under the contracts to ensure Insect Shield reported test results showing

the ACUs met contract requirements for permethrin treatment, even when they did not. Moreover, Lane instructed Insect Shield employees to sometimes treat garments for testing separately from the remainder of the lot.

### G. Consequences of Insect Shield's and Lane's Misconduct

123.    Because Insect Shield and Lane knowingly falsified and hid failing test results, the Government paid for combat uniforms that were not tested properly and/or that did not have the required levels of permethrin uniformly applied across the garment required by Government contracts.

124.    The conduct of Insect Shield and Lane caused improper testing for over 430 lots of ACUs (including some IHWCUs).  For each of these lots, Insect Shield and Lane falsely certified compliance with the contract requirements and made false statements as to the results of the permethrin testing.

125.    Insect Shield either presented these false certifications and false statements directly to the Government as part of the prime contractors' claims for payment or provided the false certifications and false statements to the prime contractors who, in turn, presented them to the Government as part of claims for payment under the contracts.

126.    These false certifications and statements were material to payment and caused the Government to pay more than $63 million for these combat uniforms.

29

## FIRST CAUSE OF ACTION
## False Claims Act: Presenting or Causing False Claims
## 31 U.S.C. § 3729(a)(1)(A)

127.    The United States re-alleges and incorporates by reference all Paragraphs of this Complaint set out above as if fully set forth here.

128.    From 2015 through at least 2021, the Defendants knowingly presented and/or caused to be presented materially false and fraudulent claims for payment or approval to the United States by failing to conduct permethrin testing in the manner required by the contracts, failing to disclose the failed test results, creating false or fraudulent test reports, and submitting false or fraudulent Certificates of Conformance for claims submitted to the United States by the prime contractors.

129.    The Defendants presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

130.    The false or fraudulent Certificates of Conformance and the false or fraudulent test reports described herein were material to the United States' decision to pay the prime contractors and had a natural tendency to influence and did influence those decisions.

131.    As a result of the false or fraudulent claims presented or caused to be presented by Defendants, the United States suffered damages to be determined at trial. Under the False Claims Act, the United States is entitled to three times the amount of

damages it sustained, plus civil penalties of not less than $13,508 and not more than $27,018 for each false claim.

132. The United States sustained damages because of this wrongful conduct.

## SECOND CAUSE OF ACTION
## False Claims Act: False Statements Material to False Claims
## (31 U.S.C. § 3729(a)(1)(B)

133. The United States re-alleges and incorporates by reference all Paragraphs of this Complaint set out above as if fully set forth here.

134. Defendants made, used, or caused to be made or used, false records or statements material to false claims, in violation of 31 U.S.C. § 3729(a)(1)(B), by reporting false test results from permethrin testing. Insect Shield's false records or statements material to false claims submitted by the prime contractors to the Government include, but are not limited to, the falsified test reports identified in paragraphs 78, 80, 85, 89, 91, 100, and 105 and the statements on the Certificate of Conformance identified in paragraphs 79, 90, 100, and 106.

135. The false records or statements described herein were material to the United States' decision to pay the claims submitted by prime contractors and had a natural tendency to influence and did influence those decisions.

136. As a result of the false records or statements made or used, by Defendants, the United States paid the prime contractors and suffered damages to be determined at trial. Under the False Claims Act, the United States is entitled to three time the amount of

damages it sustained, plus civil penalties of not less than $13,508 and not more than $27,018 for each violation.

## PRAYER FOR RELIEF

The United States demands and prays that judgment be entered in its favor against Defendants as follows:

A.  On Counts I and II under the False Claims Act, for the amount of damages for the relevant time period and the present, trebled as required by law, and such civil penalties for each false claim as are authorized by law, together with such further relief as may be just and proper.

B.  Post-judgment interest, costs, and such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case on all issues so triable.

*(signatures on following page)*

32

This the 14th day of December, 2023.

Respectfully submitted,

BRIAN M. BOYNTON
Principle Deputy Assistant Attorney General

SANDRA J. HAIRSTON
United States Attorney


*/s/ Cassie L. Crawford*
Cassie L. Crawford, NCSB # 45396
Rebecca A. Mayer, TX Bar # 24092376
Assistant U.S. Attorneys
101 South Edgeworth Street, 4th Floor
Greensboro, North Carolina 27401
(336) 333-5351
cassie.crawford@usdoj.gov
rebecca.mayer@usdoj.gov


*/s/ Jonathan K. Hoerner*
Jamie Ann Yavelberg
Michal Tingle
Jonathan K. Hoerner
Attorneys, Civil Division
United States Department of Justice
175 N Street NE, Room 10-1332
Washington, DC 20002
(202) 307-6946
jonathan.k.hoerner@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2023, the foregoing was served by electronic mail by consent upon the following:

D.J. O'Brien
Kearns Davis
Brooks Pierce Law Firm
230 N. Elm Street, Suite 2000
Greensboro, NC 27401
dobrien@brookspierce.com
kdavis@brookspierce.com
*Counsel for Insect Shield, LLC*

Jeffrey S. Southerland
Alexandria B. Morgan
Brad Jacobs
Scott Gayle
Tuggle Duggins P.A.
400 Bellmeade Street, Suite 800
Greensboro, NC 27401
jsoutherland@tuggleduggins.com
amorgan@tuggleduggins.com
bjacobs@tuggleduggins.com
sgayle@tuggleduggins.com
*Counsel for the Estate of Richard Lane*

Defendants have agreed to waive Rule 4 service of this Complaint and Summons.

*/s/ Cassie L. Crawford*
Cassie L. Crawford
Assistant U.S. Attorney

# Exhibit A to United States' Complaint in Intervention (19-CV-1026)

### List of Contracts and Prime Manufacturers
### for whom Insect Shield Applied Permethrin, 2015-2021

| Contract No. | Prime Contractor |
|---|---|
| SPE1C1-14-D-N003 | Goodwill Industries of South Florida, Inc. |
| SPE1C1-16-D-B006 | National Industries for the Blind |
| SPE1C1-16-D-B009 | National Industries for the Blind |
| SPE1C1-16-D-N001 | Goodwill Industries of South Florida, Inc. |
| SPE1C1-17-D-B012 | National Industries for the Blind dba NSITE |
| SPE1C1-17-D-N010 | Goodwill Industries of South Florida, Inc. |
| SPE1C1-18-D-1030 | Bluewater Defense, Inc. |
| SPE1C1-18-D-1043 | Excel Garment Manufacturing, LTD dba Excel Manufacturing |
| SPE1C1-18-D-1076 | M M Manufacturing, LLC |
| SPE1C1-18-D-1077 | M M Manufacturing, LLC |
| SPE1C1-18-D-1084 | Pentaq Manufacturing, Corp |
| SPE1C1-18-D-1087 | Bethel Industries, Inc. |
| SPE1C1-18-D-N025 | Goodwill Industries of South Florida, Inc. |
| SPE1C1-19-D-1111 | Aurora Industries, LLC |
| SPE1C1-19-D-1120 | Excel Garment Manufacturing, LTD dba Excel Manufacturing |
| SPE1C1-19-D-1127 | Puerto Rico Apparel Manufacturing (PRAMA) Corp. |
| SPE1C1-19-D-1137 | Aurora Industries, LLC |
| SPE1C1-19-D-1145 | M M Manufacturing, LLC |
| SPE1C1-19-D-1151 | Puerto Rico Apparel Manufacturing (PRAMA) Corp. |
| SPE1C1-19-D-1160 | Golden Manufacturing Co., Inc. |
| SPE1C1-19-D-B043 | National Industries for the Blind |
| SPE1C1-19-D-B049 | National Industries for the Blind |
| SPE1C1-19-D-F015 | Federal Prison Industries, Inc. - Clothing & Textiles Division |
| SPE1C1-19-D-F016 | Federal Prison Industries, Inc. - Clothing & Textiles Division |
| SPE1C1-20-D-1258 | Pentaq Manufacturing, Corp |
| SPE1C1-20-D-B083 | Industries of the Blind, Inc. |
| SPE1C1-20-D-F057 | Federal Prison Industries, Inc. - Clothing & Textiles Division |
| SPM1C1-12-D-1063 | SNC Manufacturing, LLC |
| SPM1C1-13-D-1020 | Bluewater Defense, Inc. |
| SPM1C1-13-D-1033 | Tullahoma Industries, LLC |
| SPM1C1-13-D-1036 | Pentaq Manufacturing, Corp |
| SPM1C1-13-D-1037 | API, LLC |
| SPM1C1-13-D-1050 | Tullahoma Industries, LLC |
| SPM1C1-13-D-1073 | Pentaq Manufacturing, Corp |

| Contract No. | Prime Contractor |
|---|---|
| SPM1C1-13-D-1074 | Pentaq Manufacturing, Corp |
| SPM1C1-13-D-F505 | Federal Prison Industries, Inc. dba Unicor |
| SPM1C1-14-D-1006 | Excel Garment Manufacturing LTD |
| W911QY-14-F-0083 | Goodwill Industries |
| W911QY-14-F-0131 | Goodwill Industries |
| W911QY-15-C-0049 | Goodwill Industries |
| W911QY-15-C-0051 | Goodwill Industries |
| W911QY-16-C-0128 | Goodwill Industries |
| W911QY-17-C-0103 | SourceAmerica |
| W911QY-17-C-0315 | SourceAmerica |
| W911QY-18-C-0165 | ReadyOne Industries, Inc. |
| W911QY-18-C-0166 | Blind Industries and Services of Maryland (BISM) |
| W911QY-18-C-0167 | Industries of the Blind, Inc. |
| W911QY-18-C-0187 | National Industries for the Blind |
| W911QY-21-C-0040 | Industries of the Blind, Inc. |